**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ESSEX INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO.: 1:16-cv-02580 |
| | ) | |
| HOUSECALL PHYSICIANS OF | ) | |
| ILLINOIS, S.C. D/B/A MD@HOME; | ) | |
| CHARLES DEHAAN; THELMA YOUNG; | ) | |
| RAQUEL BROWN; JUDITH KOHL; | ) | |
| DEBORAH CURTIS; GERTRUDE | ) | |
| GLASPIE; DEBRA LINGELBACH; | ) | |
| BRENDA NELSON; and SUSAN | ) | |
| BEESELY, | ) | |
| | ) | |
| Defendants. | ) | |

**ESSEX INSURANCE COMPANY'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Essex Insurance Company ("Essex") states as follows for its Memorandum of Law in

Support of its Motion for Summary Judgment:

**I.     PREFATORY STATEMENT**

Six of its patients sued Housecall Physicians of Illinois, S.C. ("Housecall Physicians") for

damages for sexual assault by its former employee Charles Dehaan before Essex issued Housecall

Physicians a policy of claims made Locum Tenens and Contract Staffing Insurance Policy, Policy

Number MM825507 for the period of May 1, 2015 to May 1, 2016 (the "Essex Policy"). In two of

those lawsuits, plaintiffs discovery responses contained police reports of 20-plus more victims

which put Housecall Physicians on actual notice that more claims would be made. Then, right after

the Essex Policy incepted, the same lawyer filed four more virtually identical lawsuits against

Housecall Physicians on behalf of Dehaan's former patients, and now Housecall Physicians seeks

coverage from Essex for three of them. Not only did Housecall Physicians have every reason to

know additional claims would be made, but all of these claims are obviously "related" within the meaning of the Essex Policy.

The very existence of six lawsuits that predate the Essex Policy and the discovery responses served on Housecall Physicians before the Policy incepted serves as ". . . any fact, circumstance, situation or incident which may lead a reasonable person in that Insured's position to conclude that a Claim was likely" and, accordingly, the Essex Policy insuring agreement is not triggered for the lawsuits filed after the Policy incepted. Housecall Physicians had every reason to know that it would again and again and again be sued for the same acts, errors or omissions - - and, in fact, four (4) more such lawsuits were filed in 2015 after the Essex Policy incepted. Surely those are not fortuitous claims.

Rather, these lawsuits are all so clearly "related" and none of them are within the Essex Policy coverage. The parties agree that the lawsuits filed before the Essex Policy incepted are not "first made" during the Policy period. Nor is there any genuine issue of material fact that the lawsuits filed after the Essex Policy incepted are Claims "arising out of a . . . series of related Malpractices, Professional Healthcare Services or Professional Personal Injuries" such that they "shall be considered a single Claim . . . deemed to be first made on the date on which the earliest Claim" is made. As the first such Claim pre-dates the Essex Policy and the lawsuits filed after the Essex Policy incepted "relate back" to the first Claim, none of them are Claims "first made" within the Essex Policy period. As a result, the Essex Policy's Insuring Agreements have not been triggered.

For the reasons set forth below, Essex's motion for summary judgment should be granted and the relief sought in its complaint for declaratory judgment be awarded.

II.    SUMMARY OF FACTS

Essex's Statement of Facts contemporaneously filed is adopted and incorporated herein.

## A.     The Underlying Actions

On behalf of five (5) of Dehaan's former patients, Beesely, Nelson, Lingelbach, Glaspie and Curtis, attorney Michael Gravlin filed suit against Dehaan and Housecall Physicians before the Essex Policy incepted (the "2014 Lawsuits"). SOF ¶¶1-6. After the Essex Policy incepted, attorney Michael Gravlin filed suit against Dehaan and Housecall Physicians on behalf of three (3) more of Dehaan's former patients, Young, Brown and Kohl (the "2015 Lawsuits"). SOF ¶¶32-35.

The complaints in the 2014 Lawsuits were virtually identical with those of the 2015 Lawsuits and alleged that Dehaan:

-       "under the guise of treating certain medical conditions" engaged in "intentional and willful touching" of each of the plaintiffs who "did not consent to the intentional and willful touching" (SOF ¶¶36-38);

-       fraudulently misrepresented to each plaintiff that he was examining her "for the purpose of treating medical conditions" when, in reality, he was touching each plaintiff for his own, non-consensual, sexual gratification, when he knew his statements were "false or believed the statements to be false or made the statements in reckless disregard of whether they were true or false" because he "made the statements with the intent to induce" each plaintiff "to allow him to sexually assault/abuse her" (SOF ¶¶37-38);

-       prescribed medications "in exchange for sex" and "for sexual favors and not for medical purposes" and, as a result, each plaintiff sustained injury (SOF ¶41);

-       engaged in "acts of violence or physical aggression satisfying the elements of battery ... in violation of 740 ILCS 82/5" (SOF ¶42); and,

-       "caused a realistic apprehension that [he] would commit [a battery]" which was a "physical intrusion or physical invasion of a sexual nature" and was "performed "under coercive conditions ... in violation of 740 ILCS 82/5" (SOF ¶¶43-45).

The complaints in the 2014 Lawsuits were also virtually identical with those of the 2015 Lawsuits as against Housecall Physicians and alleged that:

-       Dehaan was acting as its agent and employed by Housecall Physicians, "acting within the scope of his employment" and "directly supervised and controlled" by Housecall Physicians when he allegedly sexually assaulted the plaintiffs (SOF ¶¶46-48);

-       Housecall Physicians negligently hired Dehaan because it failed to make a reasonable, good faith effort to investigate Dehaan and his background when, had it done

so, it would have "known of his particular unfitness for his position including: (a) Committing acts of sexual assault against patients; (b) Using his position of power as a medical doctor and the person in control of his patients' physical well-being to perpetrate acts of sexual assault against patients; (c) Using patients for sexual gratification; (d) Engaging in unwanted sexually suggestive conversations with patients; (e) Advancing clinical touching and treatment as a medical provider as a means to sexually assault patients; and (f) Placing patients in non-consensual and unwanted sexual situations" (SOF ¶¶ 49-52); and,

- Housecall Physicians negligently retained Dehaan because it failed to monitor Dehaan, among other things, and "knew or should have known [Charles Dehaan] had a particular unfitness for his position including: (a) Committing acts of sexual assault against patients; (b) Using his position of power as a medical doctor and the person in control of his patients' physical well-being to perpetrate acts of sexual assault against patients; (c) Using patients for sexual gratification; (d) Engaging in unwanted sexually suggestive conversations with patients; (e) Advancing clinical touching and treatment as a medical provider as a means to sexually assault patients; and (f) Placing patients in non-consensual and unwanted sexual situations" (SOF ¶¶53-55).

Additionally, the complaints in the 2014 Lawsuits were virtually identical with those of the

2015 Lawsuits as against MD@Home and alleged that:

- Dehaan was acting as its agent and employed by MD@Home, "acting within the scope of his employment" and "directly supervised and controlled" by MD@Home when he allegedly sexually assaulted the plaintiffs (SOF ¶¶57-59);

- MD@Home negligently hired Dehaan because it failed to make a reasonable, good faith effort to investigate Dehaan and his background when, had it done so, it would have "known of his particular unfitness for his position including: (a) Committing acts of sexual assault against patients; (b) Using his position of power as a medical doctor and the person in control of his patients' physical well-being to perpetrate acts of sexual assault against patients; (c) Using patients for sexual gratification; (d) Engaging in unwanted sexually suggestive conversations with patients; (e) Advancing clinical touching and treatment as a medical provider as a means to sexually assault patients; and (f) Placing patients in non-consensual and unwanted sexual situations" (SOF ¶¶ 60-62); and,

- MD@Home negligently retained Dehaan because it failed to monitor Dehaan, among other things, and "knew or should have known [Charles Dehaan] had a particular unfitness for his position including: (a) Committing acts of sexual assault against patients; (b) Using his position of power as a medical doctor and the person in control of his patients' physical well-being to perpetrate acts of sexual assault against patients; (c) Using patients for sexual gratification; (d) Engaging in unwanted sexually suggestive conversations with patients; (e) Advancing clinical touching and treatment as a medical provider as a means to sexually assault patients; and (f) Placing patients in non-consensual and unwanted sexual situations" (SOF ¶¶63-65).

### B. The Essex Policy

After the 2014 Lawsuits had been filed but before the 2015 Lawsuits were filed, Essex issued a Locum Tenens and Contract Staffing Professional Liability Insurance Policy No. MM825507 to Housecall Physicians of Illinois, S.C. d//b/a MD@Home with a policy period of May 1, 2015 to May 1, 2016 (the "Essex Policy"). SOF ¶¶ 21-31. The Essex Policy contains the following insuring agreement:

> **INSURING AGREEMENT**
>
> A.     **Professional Liability and Claims Made Clause**: The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision:
>
> **1.**     under Coverage A. Individual Professional Liability: because of Malpractice or Professional Personal Injury, sustained by a patient and committed by the Coverage A. Insured, or by any person for whose Malpractice or Professional Personal injury the Coverage A. Insured is legally responsible, except as a member, stockholder or partner of an association, corporation, partnership or limited liability company, arising out of the conduct of the Insured's Medical Services;
>
> **2.**     under Coverage B. Organization Liability: because of Malpractice or Professional Personal Injury, sustained by a patient and committed by any person for whom the Coverage B. Named Insured is legally responsible, arising out of the conduct of the Insured's Professional Healthcare Services;
>
> provided: . . .
>
> **a.**     *prior to the effective date of this policy the Coverage A. and Coverage B. Insureds had no knowledge of such Malpractice, Professional Healthcare Services or Professional Personal Injury or any fact, circumstance, situation or incident which may lead a reasonable person in that Insured's position to conclude that a Claim was likely.*

SOF ¶22 (emphasis added).

Several definitions are relevant to the Court's analysis. "Claim" is defined as:

> **B.**   Claim means the Insured's receipt of:
>
> 1. a demand for monetary damages or services involving Professional Healthcare Services; or
>
> 2. the service of suit or arbitration proceedings against the Insured involving Professional Healthcare Services.

SOF ¶23.  The Essex Policy defines "Malpractice" as:

> **G.**    **Malpractice** means an act, error or omission in Medical Services rendered or that should have been rendered.

SOF ¶24.  "Professional Personal Injury" is defined as:

> **J.**    **Professional Personal Injury** means:
>
> **1.**    any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any patient, arising out of Malpractice;
>
> **2.**    false arrest, detention or imprisonment, or malicious prosecution of any patient, except when inflicted by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification; or
>
> **3.**    the publication or utterance of a libel or slander concerning a patient or a publication or an utterance in violation of a patient's right to professional confidence, except when published or uttered by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification.

SOF ¶25. The Essex Policy defines "Professional Healthcare Services" as:

> **1.**    Medical Services; and
> **2.**    Placement Services

SOF ¶26. The Essex Policy defines "Medical Services" as follows:

> **H.**    **Medical Services** means services, including but not limited to Telemedicine Services, provided in the medical care or treatment of any patient, but only where such care or treatment is within the scope of the Healthcare Provider's license, certificate or other qualification to practice Medical Services.

SOF ¶27.

The Essex Policy contains an Endorsement captioned SCHEDULE OF COVERAGE A. NAMED INSURED which identifies the individuals for whom coverage is provided under the Policy, subject to the Policy's terms and conditions. SOF ¶29.  Charles Dehaan is not identified on that schedule.  *Id.*

The Essex Policy also contains an Endorsement captioned SEXUAL ACTS LIABILITY ENDORSEMENT, which contains the following insuring agreement and relevant definitions:

1.  Section Insuring Agreement is amended by the addition of the following:

    B.  **Sexual Acts Liability:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 7 B. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, for Sexual Injury arising out of any Sexual Act perpetrated or alleged to have been perpetrated by the Insured or by any person for whose actions the Insured is legally responsible, or for allegations that the Insured was negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury provided: . . .

        3.  *prior to the effective date of this policy the Insured had no knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may result in a Claim under this policy.*

2.  Section Definitions is amended by the addition of the following:

    N.  **Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of the Insured's Professional Services.

    O.  **Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a Sexual [sic].

SOF ¶ 30 (emphasis added).

In addition, the Essex Policy contains the following Condition:

I.  **Multiple Insureds, Claims and Claimants:**

    **1.**  The inclusion herein of more than one Insured in any Claims or suits or the making of Claims or bringing of suit by more than one person or organization shall not operate to increase the Limits of Liability stated in the Declarations. More than one Claim arising out of a single Malpractice, Professional Healthcare Service or Professional Personal Injury or a series of related Malpractices, Professional Healthcare Services or Professional Personal Injuries shall be considered a single Claim. All such Claims, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such Malpractices, Professional Healthcare Services or Professional Personal Injury or a series of related Malpractices, Professional Healthcare Services or Professional Personal Injury is made or with regard to the notice given to and accepted by the Company pursuant to Section Claim B., Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

SOF ¶31.

## III.  ARGUMENT

### A.    Standard of Decision

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Interpretation of an insurance policy is a question of law properly decided on a motion for summary judgment. *BASF AG v. Great American Assur. Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008). The court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Id*. at 819.

### B.    The 2014 Lawsuits Were Not Claims Made During the Policy Period

Housecall Physicians has admitted that there is no coverage under the Essex Policy for all of the lawsuits filed in 2014, the *Beesely* Lawsuit, the *Nelson* Lawsuit, the *Lingelbach* Lawsuit, the *Glaspie* Lawsuit and the *Curtis* Lawsuit. SOF ¶69. The plaintiffs in each of those actions, joined as defendants in this case, have denied information sufficient to determine whether the 2014 Lawsuits were Claims made within the Policy Period. SOF ¶70.

As such, there is no genuine issue of material fact that the Essex Policy does not provide coverage for the 2014 Lawsuits. Accordingly, summary judgment should be granted as to Count II of Essex's Complaint which seeks a ruling that there is no coverage under the Essex Policy for the 2014 Lawsuits, the *Curtis, Glaspie, Lingelbach, Nelson*, and *Beesely* Lawsuits.

### C.    The 2015 Lawsuits Are "Related" to the 2014 Lawsuits and Therefore "Considered a Single Claim" and "Deemed to be First Made" in 2014

The 2014 Lawsuits and the 2015 Lawsuits allege an overlapping and continuing pattern of Dehaan's sexual misconduct on his patients during his employment before, with (and after) Housecall Physicians over a period of years. Indeed, the earliest date of sexual misconduct alleged

is in the 2014 Lawsuits is December 31, 2011, alleged in the *Curtis* Lawsuit, and the last date is January 16, 2014 as alleged in the *Glaspie* Lawsuit. SOF¶¶ 1-5. The 2015 Lawsuits allege sexual misconduct entirely between those dates. SOF ¶¶ 32-35.

Moreover, the 2014 Lawsuits and the 2015 Lawsuits all allege Dehaan's pattern of sexual misconduct against his patients during his employment with Housecall Physicians and Housecall Physicians' failure to discover his proclivity to engage in such misconduct both before hiring him and then failing to discover his misconduct during his employment. There can be no question that these lawsuits are all related within the meaning of the Policy.

The Essex Policy provides that ". . . [m]ore than one Claim arising out of a . . . series of related . . . Professional Personal Injuries shall be considered a single Claim. All such Claims, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of . . . a series of related . . . Professional Personal Injury is made . . ." SOF ¶31. Thus, where more than one Claim is made arising out of a series of related "Professional Personal Injuries," they are "deemed to be first made" on the date the first Claim is made.

Claims are deemed related where they share either a "causal connection" or a "logical connection." *See*, *e.g.*, *Gregory v. Home Ins. Co.*, 876 F.2d 602, 605-06 (7th Cir. 1989); *Cont'l Cas. Co. v. Howard Hoffman & Assocs.*, 2011 IL App (1st) 100957 (2011); *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262-63 (11th Cir. 2000) (per curium) ("the plain meaning of the word 'relate' is 'to show or establish a logical or causal connection between'"). Thus, there is no coverage if a claim made within a policy period is "related" to a claim made before that policy incepted. *See*, *e.g.*, *United States v. A.C. Strip*, 868 F.2d 181 (6th Cir. 1989) (no coverage under lawyer's "claims made" professional liability policy for claim made during policy period where policy stated that claims made that arise out of events or acts for which previous claim has been

-9-

made relate back to date on which related claim was made, and where another claim was made against one of firm's attorneys prior to commencement of policy period).

Importantly, sexual abuse claims are often found related where there is a common perpetrator. *See Knowledge Learning Corp. v. Nat'l Union Fire Ins. Co.*, 475 F. App'x 137 (9th Cir. 2012) (rejecting argument that a "series of related acts of abuse" refers only to related acts of sexual abuse involving a single victim, such that the lawsuits by six different victims constituted separate occurrences); *TIG Ins. Co. v. Merryland Childcare and Dev. Ctr., Inc*., No. 04-2666 B, 2007 WL 316571, at *4 (W.D. Tenn. Jan. 31, 2007) (sexual abuse of numerous victims by same perpetrator held to be "a series of related acts").

Courts routinely find that claims made by different victims arising from a series of acts are "related." *Cont'l Cas. Co. v. Howard Hoffman & Assocs.*, 2011 IL App (1st) 100957, ¶61 (2011) (Claims arising from law firm's lax management and failure to discover employee's embezzlement from various client trust funds over series of time all held related because they "can certainly be viewed as a 'condition that brings about an effect' (causally)"); *Gateway Group Advantage, Inc. v. McCarthy*, 300 F. Supp. 2d 236, 243 (D. Mass. 2003) ("The fact that the same [allegedly wrongful acts] may give rise to claims by different claimants, and may give rise to different causes of action based on the laws of different states does not prevent the claims from being 'related' under the clear terms of the policy"); *Highwoods Props. v. Exec. Risk Indem. Co.*, 407 F.3d 917, 924 (8th Cir. 2005) (separate lawsuits based on defendants "plan and scheme to benefit themselves at the expense of the members of the class" held related); *Lexington Ins. Co. v. St. Bernard Parish Gov't*, 548 F. App'x 176 (5th Cir. 2013) (Multiple acts of condemnation and demolition alleged in 70 underlying complaints were related as they arose either from single occurrence or series of related occurrences).

Courts also routinely find that claims are related where they arise from a pattern of similar activity. *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1264 (11th Cir. 2000) ("[t]he conduct at issue in both cases was arguably the 'same' and at the very least 'related' in any common sense understanding of the word); *Westport Ins. Corp. v. Key West Ins., Inc.*, 259 F. App'x 298, 299 (11th Cir. 2007) (repeated misrepresentations concerning the need for insurance coverage held to be a single Claim because both "causally and logically related"); *Gateway Grp. Advantage, Inc. v. McCarthy*, 300 F. Supp. 2d 236 (D. Mass. 2003) ("same course of conduct which serves as the basis for both the [investors] and [broker] litigation. The conduct at issue in both cases was arguably the "same" and at the very least "related" in any common sense understanding of the word"); *URS Corp. v. Travelers Indem. Co.*, 501 F. Supp. 2d 968, 976 (E.D. Mich. 2007) ("negligent failures to properly design the schools, regardless of whether the errors were regarding different systems designed by different engineers or whether similar errors were made in two different school buildings that resulted in different quantities of damage for each building, are a series of related acts"). To this end, many courts have found that a common modus operandi is a strong factor in finding relatedness.

The 2014 Lawsuits and the 2015 Lawsuits all are related Claims under the Essex Policy. There can be no legitimate question that these lawsuits present a "series of related" Claims that are deemed a single Claim first made in 2014. Accordingly, as the Claims are all related, there is no coverage under the Essex Policy for the 2015 Lawsuits because those claims were not first made during the policy period of the Essex Policy.

**D.** **The 2015 Lawsuits Do Not Trigger the Essex Policy's Insuring Agreement**

Even if the 2015 Lawsuits are not found to relate back to the 2014 Lawsuits, which Essex denies, the 2015 Lawsuits do not satisfy the Insuring Agreements requirements. In that regard, the 2015 Lawsuits allege that Housecall Physicians is responsible for Dehaan's misconduct on the

-11-

basis of their employment and/or agency relationship and that it negligently hired and then negligently retained Dehaan. SOF ¶¶46-66. The Essex Policy, through the Sexual Acts Liability Endorsement, provides coverage for Claims that the insured was:

> . . . negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury provided:  . . .
>
> 3. prior to the effective date of this policy the Insured had no knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may result in a Claim under this policy.

SOF ¶30.  Neither of these requirements are satisfied.

### 1.     Dehaan Is Not An "Insured person" Under the Policy

To trigger coverage under the Sexual Acts endorsement, the Claim must concern the Insured's alleged negligence "in hiring, training or supervising ***any Insured person*** who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury."  SOF ¶30 (1. B). The Policy contains a schedule of individual insureds that are "Coverage A" insureds. SOF ¶29. Dehaan is not listed in that schedule. *Id.*  Housecall Physicians has admitted that Dehaan is not identified on the schedule of individual insureds to whom the Essex Policy provides coverage. SOF ¶69. The Plaintiffs in the 2015 Lawsuits have denied information sufficient to determine whether Dehaan is identified on the schedule of individual insureds. SOF ¶70.

As such, there is no genuine issue of material fact that Dehaan is not an "Insured person" within the Sexual Acts Liability Endorsement. Accordingly, there is no question that the 2015 Lawsuits do not allege that Housecall Physicians was " . . . negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury" to trigger the Sexual Acts Liability Endorsement insuring agreement. Consequently, summary judgment should be granted as to Count III of Essex's Complaint.

### 2. Housecall Physicians Had "Prior Knowledge" of Dehaan's Misconduct

The Essex Policy Insuring Agreement and the Sexual Acts Endorsement Insuring Agreement state that coverage is not provided for any Claim, when prior to the May 1, 2015 effective date of the Policy, the Insured was aware of a circumstance, situation or incident which may result in a Claim. SOF ¶¶22, 30. There is no question that Housecall Physicians knew before the Essex Policy incepted that additional lawsuits would be filed resulting from Dehaan's criminal sexual proclivities.

Before the Essex Policy May 1, 2015 inception, the same lawyer had filed more than five (5) lawsuits against Housecall Physicians with virtually identical allegations and that lawyer had answered discovery in two (2) of the lawsuits producing police reports that set forth 20 some additional victims of Dehaan's sexual misconduct. No doubt Housecall Physicians had actual knowledge that additional lawsuits would likely be filed. To be sure, at least one of the 2014 Lawsuits expressly alleged that Dr. Dehaan "had a past history of committing sexually inappropriate acts with patients of his in their residences, many of which such acts were reported on numerous occasions to local police departments." Surely these allegations put Housecall Physicians on notice of the potential additional claims and the individuals that could bring such claims were identified in police reports produced to Housecall Physicians in those lawsuits.

Nor is there any question that the police reports and other discovery produced in the two 2014 Lawsuits prior to the Essex Policy inception put Housecall Physicians on notice. In response to Essex's discovery requests in this case, Housecall Physicians answered that the discovery responses served on May 19, 2015 in the *Shortridge* Lawsuit provided "first notice" of the Petition for Temporary Suspension of the Physician and Surgeon and Controlled Substances licenses of Charles Dehaan, MD, filed by the Illinois Department of Financial and Professional Regulations on January 16, 2014. SOF ¶73. In that regard, Housecall Physicians broadly admitted as follows:

> In January of 2014, Joan Shortridge filed a complaint against Dehaan, Housecall, and other defendants. That was the first time Housecall learned of any complaints or misconduct of DeHaan. During the course of discovery, in May of 2015, Housecall received documents in discovery from Shortridge's attorney, which related to various professional and criminal actions against DeHaan. Housecall had no knowledge of those actions prior to the aforementioned production of the documents. See documents produced as HC 168-273.

SOF ¶73.

Most importantly, however, the documents Housecall Physicians produced marked HC 168-273 which it contends were "first notice" had been served on Housecall Physicians twice before the Essex Policy incepted - - on February 6, 2015 in the *Lingelbach* Lawsuit (SOF ¶¶ 7-13) and on April 6, 2015 in the *Beesely* Lawsuit (SOF ¶¶ 14-19). Clearly information received by an attorney in the scope of her representation is imputed to her client. *Washington v. Parkinson*, 737 F.3d 470, 473 (7th Cir. 2013) (citing *Frey v. Fraser Yachts*, 29 F.3d 1153, 1158 (7th Cir. 1994). *See also*, *Foley v. Metro. Sanitary Dist. of Greater Chicago*, 213 Ill. App. 3d 344, 351 (1991) ("Generally, notice to an attorney is notice to the client and knowledge of an attorney is knowledge of, or imputed to, the client notwithstanding whether the attorney has actually communicated such knowledge to the client").

The purpose of excluding claims for which the insured had prior notice was articulated in *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90 (1992), where the Illinois Supreme Court said:

> By its very nature, insurance is fundamentally based on *contingent risks* which may or may not occur. [Citations.] One dictionary defines 'insurance' as '[a] contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an *unknown or contingent event* and is applicable only to *some contingency or act to occur in [the] future.*' (Emphasis added.) (Black's Law Dictionary 721 (5th ed.1979).) If the insured knows or has reason to know, when it purchases a CGL [commercial general liability] policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss. [Citation.] Where the insured has evidence of a probable loss when it purchases a CGL policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the 'risk of liability is no longer unknown.' (*Appalachian Insurance Co. v. Liberty Mutual Insurance Co.* (3d Cir.1982), 676 F.2d 56, 63; [citations.]) Therefore, the

-14-

insurer has no duty to defend or indemnify the insured with respect to the known loss *ab initio,* unless the parties intended the known loss to be covered.

*Id.* at 103–04.

Here, quite clearly the risk Housecall Physicians sought to insure - - Claims arising out of its relationship with Dehaan - - were not contingent. Rather, Housecall Physicians had knowledge of such misconduct and Sexual Acts by Dehaan as well as facts, circumstances, situations and incidents involving such conduct which may result in a Claim under the Policy. It had received several complaints that expressly alleged that there were additional victims, and that Dehaan's conduct was part of a pervasive pattern, and it had also received police reports and other documents that confirmed those allegations. Thus, there is no coverage for the 2015 Lawsuits under the Sexual Liability endorsement because Housecall Physicians "had [] knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may result in a Claim under this policy" and similarly there is no coverage under the Policy.

## IV.    CONCLUSION

Essex Insurance Company respectfully requests that this Court grant its motion for summary judgment and provide the judicial declarations requested in its complaint[1] and requests an Order of this Court finding and declaring:

a.      Essex has no duty to defend either Charles Dehaan or Housecall Physicians of Illinois, S.C. d/b/a MD@Home under Policy MM 825507 in the *Young, Brown, Kohl, Glaspie, Nelson, Curtis, Lingelbach*, and *Beesely* Lawsuits.

---

[1] To the extent that this Court finds a question of fact, Essex reserves the right to depose Housecall Physicians' person most knowledgeable.

-15-

-16-

      b.       Essex has no duty to indemnify either Charles Dehaan or Housecall Physicians of

Illinois, S.C. d/b/a MD@Home under Policy MM 825507 in connection with the *Young, Brown,*

*Kohl, Glaspie, Nelson, Curtis, Lingelbac*h, and *Beesely* Lawsuits; and

      c.       For such other and further relief as this Court deems just and appropriate.

DATED this 13th day of February, 2017.

Respectfully submitted,

COZEN O'CONNOR

/s/ Anne L. Blume
One of the Attorneys for Plaintiff,
ESSEX INSURANCE COMPANY

Steven D. Pearson
Anne L. Blume
David L. Sanders
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606
(312) 474-7900
(312) 474-7898 (fax)

-17-

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on February 13, 2017, he caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court and served upon all counsel of record using the Court's CM/ECF system.


/s/ David L. Sanders